Mr. Hine for the petitioner, Mr. Totaro for the respondent. Good morning. May it please the Court, my name is Robert Hine and I represent the petitioner Francis Lorenzo. The SEC's order in this matter permanently barring the petitioner from working in the securities industry and imposing $15,000 in civil penalties must be vacated for three reasons. First, the SEC's holding that the petitioner was the maker of the statements in the two e-mails that are at issue is contrary to the holding of the Supreme Court in the Janus Capital case. Second, the SEC abused its discretion and acted in an arbitrary and capricious manner by imposing a permanent bar because it ignored its own precedent in similar cases. And third, the Commission abused its discretion when it held that the three statements that were contained in the e-mail violated the anti-fraud provisions of the Federal Securities Law. Could I ask you, at least for my sake, to jump to the second argument about what's our standard of review for Commission sanctions? It seems that there might be some tension in our case law. It's an abuse of discretion standard. The Court will review the sanctions imposed by the SEC and has held that the SEC has to have some connection with its precedent in terms of the dramatic departures from an issue here. Where have we held that it has to have a connection to its precedents? The Rappaport case that we cite. In addition, the SED case that we cite also deals with mitigating factors that the SEC failed to consider in the proceeding below. So I'm looking at Kornman in 2010 when we said the Commission is not obligated to make its sanctions uniform, and the Court will not compare this sanction to those imposed in previous cases. What do we do with that? Well, I do acknowledge that there is different language in different cases regarding the appropriate standard of review. Our position is I think the best practice in terms of reviewing Commission decisions and consistent with the Administrative Procedures Act would be an abuse of discretion and saying that the SEC does have to have some connection with its precedent. So the language I read you from Kornman, you think that's just wrong? We overruled that? We have to live with that, right? Yes. I think there's other statements of the standard of review. For instance, the Rappaport case that we cite, the D.C. Circuit has expressed the standard of review in different language. But the Commission does not, in our view, have unfettered discretion to impose a sanction that's completely out of line with precedent in similar cases. Collins says that we have to look at the other cases, right? Right. There's also the Collins case. How do we square these cases? Well, it's not so easy. I think that there is different language in different cases, but I think the weight of the Circuit's language in the various decisions do indicate that there is a review process in place at the Court to look at the Commission's decisions and sanctions and holding that there has to be some connection between the Commission's sanctions in particular cases to the precedent that was issued previously for similar facts and circumstances. In this case, that ties into our Flannery citation. So what do you want us to do? If we agreed with you on that, what would you want us to do? We would send it back to the Commission to conduct that sort of analysis or what? Well, I think, no, I think the issue would be that the Court would vacate the Commission's award and then based on our first and third argument that Mr. Lorenzo was not the maker of the statement and that it was... Well, let's say if we didn't agree with you on that and the only thing we were interested in were the sanctions. Yes, then I think it would be appropriate to vacate the sanctions and send it back to the Commission for consideration in terms of the guidance that the Court would give with regards to looking at its own precedent. On these facts, I'm sorry to interrupt. On these facts, do you think there's any way a lifetime bar can be justified? No, I don't. I think it's clear that the, in this case, we have essentially the same and in comparing that scenario and that factual situation to other facts... What's the closest factual scenario to this one in which the Commission imposed a lifetime bar? In reviewing the precedent, we really didn't see anything... Well, one's got to be closer than another, right? I mean, so what's the closest? I haven't seen anything that would justify a lifetime bar for sending two emails. Mr. Chairman, I've been in the securities industry for 25 years. This was an isolated incident involving two emails and there's no evidence that there was any connection. But what I'm trying to get at is what is the distance between your case and the next closest case? How far away is that? Oh, I see. I think the Commission's precedent in Flannery is the appropriate one where there's a one-year suspension that was imposed where executives made misrepresentations regarding certain quality securities that were going to be held in the fund. And I think the Flannery case is particularly relevant because it's a recent case. It also came after the Janus case looked at a lot of the issues with respect to whether a person was a maker of the statement or not. So in our view, the closest case, even though we don't agree that a suspension would be appropriate, our view is that the closest precedent would be the one-year suspension that was handed down in the Flannery case. And the SEC did look at Flannery and explained why it thought that Flannery wasn't comparable based on degree of egregiousness. Yes, they did look at the Flannery case, but in our view, their analysis was superficial and also not reasonable. The SEC tried to distinguish Flannery by saying that the statements in this matter, Mr. Lenzo's matter, were more egregious when in fact the Flannery statements were much more egregious because they involved significantly more money that was at stake. And the degree of scienter. The degree of scienter was one of the points that the SEC made, but essentially the SEC was distinguishing the Section 17A degree of scienter being the negligence one with respect to the heightened scienter standards here. But in our view, that was just elevating really form over substance. Courts have held that 17A and 10B are very closely connected. They both involve misrepresentations. We do challenge the SEC's finding that Mr. Lenzo acted with scienter. But even assuming that the SEC was correct on there, we don't feel that that distinction justifies such a dramatic departure upward for a permanent bar from the securities industry for essentially the same email that was sent to two people. In the Flannery case, the misstatements were contained in multiple contexts, and they occurred for over a two-year period. So I think in any reading of the Flannery case, it's unreasonable to say that Mr. Lorenzo's conduct was more egregious and deserved such a much more severe sanction. Can I ask you a question about your Janus-related argument? So suppose that we disagree with you, just for arguments purposes, on the proposition that Janus not only affects 10B by B, but also affects the other violations that are the sanctions we've been talking about. If that's true and Janus is capped at 10B, 5B, but the commission predicated its sanctions, the fine and the lifetime ban on 17A, on 10B, 5A, 10B, 5C, and Section 10A, and those aren't affected by what you perceive to be a Janus problem, then what's the result? Well, I think the result is still that the commission's decision needs to be vacated, because in that scenario, if Janus was just limited to 10B, 5B, the subsection that you were referencing, you still get into the scenario of the dramatic departure from the prior precedent. So in this scenario, even if you assume that the statements were accurate. Well, that would be there even if we disagreed with you on Janus at all, I think, right? Because even if we thought that liability was, that he was the maker, you'd still have an argument about disproportionality. Yes, that's correct. I was trying to get away from that argument and just say that you have a legal argument as to why sanctions shouldn't have followed here at all, period. Not that it's disproportionate with respect to some other case, and therefore, regardless of liability, there's a problem with the degree of sanctions. But you have a legal argument that says that there just shouldn't have been any penalty here at all, because of Janus, and then the way you get to the other offenses is you say, well, the Janus make standard applies to the other grounds for liability, even though those provisions don't use the term make. And I guess what I'm asking is, if we reject that attempt at extension of Janus, but suppose we agree with you that Janus gets you home on 10B, 5B, the fact that there are other legal predicates for the sanctions that you're challenging, where does that leave us? Well, I think that leaves us with our fallback position regarding the abuse of discretion. Okay, so we're back. Yes. Wouldn't we vacate because the commission didn't rely on that? I mean, wouldn't there be a Chenery problem? That's the question. I'm sorry. Ordinarily, if an agency relies on three grounds for something, and it comes up here, and we say, well, two of the three are okay, but one of them is not good, we usually remand it back to the agencies for them to decide whether they would have done the same thing even with the two grounds. Yes, I agree. Unless we think that it's clear that the agency independently would have reached the same outcome. Right. Based on the ones that are remaining standing. And I think that's what I was getting to, is even if you're right on Janus, if Janus doesn't seep into the other predicates, is this a situation in which we can reliably say that the agency would have reached the same conclusion if you take 10b by b out? I don't think so. I think in this scenario there is different language for the different sections. And one of the commission's rationales in terms of imposing the sanctions that they did was the various provisions of the rules and the statutes that they considered. So in our view, it would still have to be sent back to the commission for reconsideration. Can I ask a question about the facts for the Janus issue? Because obviously it's odd that Francis Lorenzo is the main witness for the SEC, but do we know who composed the October 2nd emails? I think there was conflicting testimony in the record about that. The 14th ones, the second, so the original. Yeah. They're sent from Sarah, I believe. Yeah. I believe the evidence overlaps in the sense that it was the same procedure that was used and there was different testimony as to whether Greg Lorenzo, who has no relation to Francis, drafted the email and that Mr. Lorenzo just cut and pasted it into the other format that went out under the investment banking commission. Are you talking about the second one now or the 14th? That's the 14th. On the second, there's very little testimony about the second, and my understanding of the facts is that the 14th email is cut and pasted from the email that went out on the second, if I have the dates correct. Yes. And then I was trying to figure out, well, okay, who drafted the thing on the second? We know it went out from Sarah, who's Frank Lorenzo's assistant, I believe. Yes. But the testimony is, and I think the cease and desist order that the commission has for another one, says it's some combination of Greg Lorenzo, Francis, and Mike. I'm forgetting Mike's last name. Yeah. I think it's fair to say the record is unclear with respect to how that first email was drafted, and it doesn't get into the details in terms of who drafted it or whether it was cut and pasted from Greg Lorenzo's draft and put into Francis Lorenzo's. So I think essentially the record is unclear in terms of how that first email first came about. When you say cut and pasted from Greg Lorenzo's draft, is Greg Lorenzo's draft was October 2nd, or is that something else? I think that's the implication of the testimony is that Mr. Lorenzo cut and pasted what Greg Lorenzo drafted and cut and pasted it both into the first email and then into the second email as well. I didn't get that into the first email. I think the record's got some holes here, but we'll explore that with the commission. But I couldn't figure out from reading the trial transcripts what happened in the first email. I agree with Your Honor. I don't think it's very clear at all. And I think that's one of the faults of the SEC decision is that they didn't view the evidence in a reasonable light to reach the conclusions that it was Mr. Lorenzo's. I still don't understand it. When you say the first email, are you talking about the first of the two emails that went on the 14th? I wasn't. I was talking about the October 2nd. I'm just trying to make sure that you're on the same wavelength. When you say first email, are you talking about the first of the two emails on the 14th, or are you talking about a prior email from the second? I was talking about the first on the 14th. Right. What did you say about that now? Because I was operating on a different understanding. I was saying the record was unclear as to the details as to how that came about. Mr. Lorenzo tested, Francis Lorenzo. I thought, correct me if I'm wrong, on the 14th, so I'm going to call them the 14th emails, the two emails on the 14th, that those were cut and pasted from the emails that had been sent on the second. Is that wrong? I believe it's incorrect. I think that the record indicates that the second email on the 14th was cut and pasted from the first email that came out, and it's not clear as to whether there was a cut-and-paste procedure performed also on the prior emails earlier on in October. Yeah, I'm a little bit confused. I thought the way you were construing the facts in the light most favorable to your claim was that there was a lot of verbiage in the transcript about cutting and pasting, and the impetus, the upshot of that was that he had cut and pasted, Frank had cut and pasted something that was prepared by somebody else, seemingly Greg, and then just sent that out in both emails on the 14th. Yes. And then the question is, what is the thing that he cut and pasted from? What is the supposed Greg email text from which Frank cut and pasted? I think a fair reading would be that Greg drafted something perhaps in a Word document or something else. I mean, it's really not explored. It's not some other email. It's something that was going on around the time of the 14th. Correct. You don't think it's from the second? No. I might have misread that. No, I don't think it's from the second. We don't know what the email on the second said, do we? No, I don't think that that's an issue. But it wasn't in the debenture points? Wasn't it titled the same way? Well, I think both emails from the 14th relate to the debenture points that are at issue in this case. So, too, the emails on the second, though, right? I don't believe so. I think it's both of the emails on the 14th that the commission issued its opinion on with respect to Lorenzo sending them out. Then I'm confused. What were the emails on the second about? I don't have that in front of me on the record, but I think the emails are the same ones. Well, I don't recall. I just want to try to pin this down because I think we might have an exchange with the commission about the factual credit for this. So I don't recall your basing an argument on anything that happened before the 14th. I understood your argument to be the following, that Frank sends out two emails on the 14th that are the subject of the case. Some other stuff was going on behind the scenes on the 14th because your view is that Frank never made the statements. He was basically just doing what he was told by Greg. But Greg was telling him what to do on the 14th. I don't know exactly what vehicle that was. It could have been a Word document. It could have been another email. It could have been something that he cut and pasted from. But all that stuff was going on in the immediacy of the moment. Is that your argument? Yes, that's exactly right. That's the argument that you think puts your client in the best light? Yes. Okay. Why I was focused on the prior email is this is not helpful for you, what I'm about to say, which is that if Frank had drafted the prior emails and cut and pasted from one of his own prior emails, that's not particularly helpful for him. And so I was trying to figure that out, but it sounds like it's just a black hole in terms of where it came from. Yes, I don't think the record is really clear on that point at all. Okay. And the other component of our argument, the third part, is that we don't feel that the evidence, even if granting the commission. Before you get to Janice's point, I'm going to ask the commission about this, but how do we draw the line in a factual circumstance like this? Janice says one who prepares or publishes a statement on behalf of another is not its maker. And I don't know. That leaves a lot for interpretation, it seems to me. Yeah, I think in my view this is a pretty clear case of just distribution and publication. Greg Lorenzo was the subordinate. I'm sorry, Francis Lorenzo was the subordinate of Greg Lorenzo. The record indicates that Francis just cut and pasted. So even if you know that you're sending out something that's completely fraudulent, because your boss asked you to send it out or because you can pin it on some chain of command thing, you're in Janice land? Well, I wouldn't agree that that is the situation in this case. No, I understand that. I'm just testing the hypothetical about what Janice will extend to. Yeah, my boss told me to send it out. And you know to a certainty it's completely fraudulent, and you come in at the hearing and say, well, my boss approved it, my boss said it. Janice could cut a pretty sharp knife through liability for people who are culpable. Maybe you're going to say they're all haters and abettors or something. Yes. I mean, I think the argument there is essentially it's the analogy to the speech writer and the drafter, so that the person who's writing the speech, even if they write it and they know something is not true that they've been asked to write about, and then the person who has the ultimate control delivers the speech, the drafter does not become liable or a maker of the statement, even though he knows at the time that it was not true. But as you pointed out. Here the scenario is the reverse direction, although probably the same principle, which is the principle is giving some kind of direction of sorts, and then the subordinate is doing the actual expression. Yes, and that's exactly what the aiding and abetting availability and claim is, that the SEC can take a scenario like that where a person is participating in creating something that they maybe know is not truthful. In that scenario under Janice, they would be an aider and abetter, which the SEC has full authority to prosecute. They didn't do that in this case, but that scenario would come under the aiding and abetting statute. And aiding and abetting, I assume, has lesser penalties. Is that correct? Not necessarily. I think the Commission and the courts look at the same factors, the egregiousness of the conduct, where the losses occur, the level of scienter, so that the penalties could be the same. So aiding and abetting always applies under 10b-5b as a possibility? Yes, absolutely. The Commission has other remedies for people who assist the principal violator, the person who made the statement, that they could certainly be charged as an aiding and abetting the principal in making that statement. So the speechwriter could? Yes. I'm sorry, yeah, the speechwriter. The speechwriter. As long as they also have the representativeness to enter. So it couldn't be someone who did something unknowingly. That's right. If they were knowledgeable about the fraud, then they end up in a better land, and it's the same degree of penalties. That's correct. And what's achieved by coordinating it off at MAKERS, then? I guess it's for the unknowing, the people who don't know. Yes, it's for the unknowing. It's a different scienter standard. It ties into the language of Section B, Rule 10b-5, requiring the making of the statement. For aiding and abetting, I think you have to have a higher level of mens rea normally. Generally, you have to have that same recklessness standard that a primary violator would have to have, intent or recklessness. Thank you very much. Thank you. May it please the Court, Martin Totaro for the Securities and Exchange Commission. First, a factual clarification. The October 2nd email, it's Exhibit 114, so it is in the administrative record, but unfortunately it's not in the joint appendix, but I would be happy to send it to the Court. What's your understanding of, I think I have an understanding of who drafted that, which is we don't know. It's some combination of, it went from Sarah, correct? It went from his assistant, that is correct. That's Sarah? Yes. And it's some combination of Greg or Frank or the third party. So two points on that. First, the text of the email is largely the same as the October 14th email. That's what I thought. That's what I thought. And then the second point, so is the signature at the bottom of that email. It comes from Frank Lorenzo's. She forwards it on behalf of Frank Lorenzo's account, and it says, please call me if you have any questions, Frank Lorenzo, not Greg Lorenzo. But that's never been, the SEC's theory has never been that the October 14th emails were merely transposed from the October 2nd email, or has it been? Did I miss that? I agree. I think the record is factually murky on that issue. The SEC decision doesn't say that Frank is responsible because the 14th emails come from other emails that he drafted on the 2nd? No. The commission decision focuses on the words in Janus, which we're looking at attribution, delivery, and that doesn't necessarily depend on who drafted the actual email. Otherwise, the Janus case itself would probably come to a different result. And in terms of the Janus theory that the commission applied below and that you defend today, the evidence that supports the proposition that Frank Lorenzo had the requisite role in crafting the email under Janus, as far as I can tell, it boils down to one statement, which is the statement at JA 155, if memory serves me, I think I authored it, and then it was approved by Greg and Mike. And I'm not saying that's not enough. I'm just saying that as far as I can tell, in terms of responsibility for crafting the 14th email, it comes from that statement. I think it comes in part from that statement, Judge Renovason, but I would also flip the page in the appendix to go to 156, where they're talking about prior testimony, where Lorenzo concedes that he did not recall discussing either of the emails or the subject matter of the emails at all with Greg Lorenzo. So as to that, it seems to me that if, as I understand Frank Lorenzo's argument, his argument is, look, I was just a pass-through agent. I got a bunch of text from somebody else, I cut and pasted it, I forwarded it. If that's, in fact, what happened, then what you pointed me to on 156 actually would be consistent with that because he'd be saying, yeah, I didn't talk to Greg about it at all because all I did was took what Greg gave me and just sent it off. Or the alternative reading is that I didn't discuss either the emails or the subject matter of the emails because I drafted them. Yes, so if it gets back to him drafting it, then I just don't see how that's necessarily helped by 156. Because 156 seems equally supportive of either scenario, at least equally supportive. And then it gets back to 155, which is the statement that if memory serves me, I think I authored it, and then it was approved by Greg. Yeah, I think what this discussion is illustrating is that his testimony was incredible and all over the place on this particular point. Then why did the ALJ say that Greg drafted it? Because the ALJ saw the witness. That is correct, and then the commission on a de novo review of the record weighed the evidence differently. And how. I'll just show my cards here. My big problem with what happened here on the Janus point is that the ALJ makes a fact finding that really destroys you guys on Janus, and the commission just niftily kind of avoids that in footnote 32 and refashes the facts. But the only way, correct me if I'm wrong, because this is my concern, the only way to say, well, actually Greg didn't draft it, is to disbelieve what Francis was saying, because Francis is the only witness. I think two points. And the question, then the follow-up question, which is probably obvious, was how can the commission do that when they don't see Francis? Two points, Your Honor. First, the legal and then the factual. The first, the legal point, under Section 25.8.4 of the Exchange Act, what is on review before this court are the factual findings of the commission. I know, but don't we look at whether there's a basis for the factual findings, a reasonable basis? Absolutely, Your Honor. And on that point, I counted at least five ways Frank Lorenzo described his role in drafting the e-mails. 209, he said his role was inadvertent. 217, Greg Lorenzo asked me to send the e-mails out. 125, it was offered by me, Mike Molinaro, who is the compliance officer, and Greg. That's the earlier one, isn't it? I thought the one that I think that's referring to. Go ahead. I don't want to interrupt. And then later on the same page, as Judge Srinivasan mentioned, I think I authored it and then it was approved by Greg. But authored could mean sent it. He did send it. We know that. And he did actually do the work of taking from some source and putting content into the body of the e-mail. That's undisputed, right? Yes, Your Honor. But I think if Janice teaches us anything, it is who typed the words on the page is not dispositive of who is a maker under 10b-5b. Because in that case, the investment advisor who drafted the statement in Janice would have been on the hook. But that certainly wasn't the case. Rather, what do we look to? I agree with Judge Kavanaugh when you said it is a bit opaque, where the statement in Janice is at 142 and 143. It says, one who prepares or publishes a statement on behalf of another is not its maker. Right. But if you go forward to the next line, and in the ordinary case, attribution within a statement or implicit from the surrounding circumstances is solid evidence. Here we have that. We have an e-mail. Whoa, whoa, whoa. I thought that sentence helped Frank, because he says in the e-mail that he refers back to Greg. It's at the request of Greg. It's at the request of Greg. It doesn't say, for example, on behalf of, which I think would be a different case. So, for example, if my father said, call your mother. You really think it would be a different case? The commission's hinging the whole lifetime bar on if he said on behalf of, rather than at the request of, he'd be good to go? I think on behalf of would make this a more difficult case. At the behest of is meaningfully different. As I mentioned before, if I called my mother because my dad said, call your mom, I would call her at the request of my father. But the content of that conversation wouldn't be his content. It would be the conversation between my mother and me. So I think there's a meaningful difference between on behalf of, which, again, referring back to Janice, the sentence included is focusing on behalf of. You might be right. You may prevail. That's unbelievably thin for the difference between no liability and a lifetime bar that takes you out of your occupation. But then if we continue on Janice, it said, even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And here I don't think there's any dispute about who delivered those emails. Well, that's why I said the speechwriter hypothetical is actually flipped from the current situation, because you could have two situations. The speechwriter prepares something for the principal, or the principal says, go send the client X, which all of us who've worked anywhere have been the receiving end of those directions from a superior, and we go try to do something on behalf of our superior at the request of. I know you're drawing a distinction between those two things. And then the content, I guess, prepares. I'm just trying to parse Janice. One who prepares a statement on behalf of another. So if he composes it on behalf of Greg, that seems to be protected by Janice too. Unless he also delivers it, which he did here. No, because publishes also. Prepares or publishes, which would cover preparing and publishing, presumably. Right. I think one potentially helpful case here would be the Glickenhaus case from the Seventh Circuit, where it looked at who was behind the scenes and who made the statement, and then who ordered. That's one person. And then that person ordered another person to disperse the statement into the public sphere. The Seventh Circuit concluded that both of those individuals were makers under Janice. That might be wrong. I'm just trying to figure out what Janice said. If someone's telling me to send something, and I have some limited discretion about the content of what I put into the email, but I've been given general directions, go tell the client that we're going to make the following argument. This is how we've all lived, and someone gives you that direction, and then you flesh it out a little. And it's still sent on behalf of your boss. My question is, and I really don't know the answer, so I don't mean this is a hostile question, is how do we figure out whether that scenario with some limited discretion with the basic direction being given by the boss, have you prepared the statement on behalf of another? You're not the maker if you have, or have you prepared the statement on behalf of yourself? So if the facts are that you have discretion to alter the statement that's going out, I think you very well could be a maker under Janice. Although, Judge Kavanaugh, if you're looking for a limiting principle, I think CNTR would provide one there. How? Because if you're altering a fraudulent statement in a way where you have no knowledge of the fraud, for example, and you send that out, then you are not going to have the level of CNTR requisite to have liability imposed. Why not charge them as an aider and abettor here? Let's not ask this case, but in general, why wouldn't this kind of scenario be easily charged under aiding and abetting? What's the downside from the commission's perspective of doing so? For an aider and abettor, do you still have to have a primary violator? Well, the primary violator is Greg. You guys hammered him, and he's done. It is not clear to me that Frank Lorenzo would consider Greg Lorenzo to be a maker of those statements. If he was, then, yes, we very well could have him. But you consider him.  I didn't mean Frank. I meant the theory he's offering before you today. But, yes, if there is a primary violator. I got it. If he is a primary violator. I think it's pretty obvious, and certainly the sanctions that you all imposed to the DM, there was some kind of agreement. But Greg was a primary violator on all this stuff, and it's a lot more than just this. On much of the conduct, but for these two particular emails, I think under attribution and delivery, Greg Lorenzo is the maker under Janus. Can I ask you this factual scenario? So suppose the facts were this, and I know you're going to say that these aren't the facts, but suppose the facts are this, that Greg Lorenzo says, I'm going to send you some text, all right? I want you to come out from you because I wanted to come from the investment division or whatever the technical term is. But I'm going to send you the body of what I want you to send, all right? And Frank Lorenzo says, sure, I'll do that. Sends him, and he does what he says he does, which is cut and paste what Greg sends him, fills in the to line, which, of course, he has to do, and then sends it out. In that situation, is Frank a maker under Janus? Probably not, Your Honor. I think he would have two arguments. First, there's a misattribution because that email, like the emails here, would still say, I'm summarizing what the investment banking division, and he was the head, is doing here. So under that scenario, it would be attributed to him, but under Your Honor's hypothetical, that attribution would be incorrect. Right, because Greg just says, I want it to come out from you, but I'm going to tell you what to say, and I'm your boss, so I can do that. So the attribution, I mean, it's built into the hypothetical that Greg says, I want it to come out from you, but I'm going to tell you what to say. It is built in, and that's what we would push against. And then second, again, what would your answer on that, just so I'm clear, liable or not liable for Frank? Not liable. Not liable, right. Not liable, and that sounds like this case. So that's the question, because then it seems like every, as far as I can tell from the record, every statement that Frank makes about the events that transpired are completely consistent with and supportive of that scenario, except arguably the one that we were talking about earlier, where he uses the term authored it. So I get that you could, in theory, read into authored. I had some role in formulating the content of this e-mail, and it was approved by Greg and Mike, but I kind of fashioned it. But if you drop that one out, of course you don't want us to, but if you drop that one out, it seems like everything else turns on this cut-and-paste notion, which is that I just took some text that somebody else gave me. It's my boss. I sent it out, because that's what I was told to do. He says stuff like that all the time. I simply was asked to send the e-mail out. I inadvertently sent it out at the request of my superiors. I cut-and-pasted the e-mail and sent it to them. I was asked to send these e-mails by Greg Lorenzo to his clients, and unfortunately I did it. I cut-and-pasted it and I sent it. These are all just statements from his transcript. Judge Schroeder-Costin, on that point, I think we have inconsistent testimony. The Commission made a determination, a factual determination. Just to be precise, when you say there's inconsistent testimony, is the inconsistency grounded in that answer on 1K, 155? That's part of it, yes. And then the statements I mentioned before, my e-mail, 209, 217, 155, and 156 I think are the key pages. So 156 you talked about earlier, 155 you talked about. What are the other ones? 209. This is the e-mail, sending the e-mails inadvertently. Right, but why is that? That seems, it just, I don't know what that means. It demonstrates that his testimony is inconsistent, where he's not even acknowledging that he sent out the e-mail. It's slightly inconsistent with where he said he did not recall discussing either the e-mails or the subject matter of the e-mails with Greg Lorenzo, and it's particularly inconsistent with I think I authored it and then it was approved by Greg. And inadvertent just makes it sound like I was unconscious when I sent the e-mail. And he doesn't challenge willfulness on appeals. I'm sorry? And he doesn't challenge willfulness on appeals. So I think that is incredible testimony and demonstrates the inability of Frank Lorenzo to testify truthfully or consistently throughout the proceedings. He had other inconsistencies that the Commission pointed out at 921 of the appendix. In his prior testimony he said Greg Lorenzo is an honest guy. He said waste energy is a high-quality project. He said working with Greg Lorenzo to make Charles Vista was in an effort to make the Charles Vista high-quality investment bank decision, and then before the Commission later he testified directly. There's a lot of inconsistency. There still has to be some facts from which the scenario that gives rise to liability exists. And that's what I'm trying to get my mind around, because the scenario that results in liability is that he had a role in forming the content of the e-mail that went out. That makes him a maker. And as far as I can tell, the only evidence that supports that proposition is that snippet on 155. Because I don't see 156 as doing that. I don't see 209 as doing that. I don't know if we've gotten to 211 yet. But is there something on 211 that says that he actually had a role in formulating the content? I think 211 is not part of it. I don't think I mentioned 211. That was a mistake. But 156, one interpretation of 206, where we do not recall discussing either the e-mails or the subject of the e-mails at all with Greg Lorenzo, was because Greg Lorenzo wasn't part of the process. Frank Lorenzo authored it. And that's confirmed. That just seems. . . I get that that's. . . Due to naked isolation, I totally take your point. It's just that everything else that he says is that I cut and pasted it. Except for 155, Your Honor, where he said. . . He authored it. And then he says it was. . . I don't know what authored. I would have taken authored, and it could mean. . . I mean, he did author it in the sense that it came from him. We don't know what that. . . I mean, authored could mean I sent it, it was from my e-mail account, I was the one who physically cut and pasted it. I think to the extent there is murky testimony or testimony that cuts both ways, I don't know if it's this Court's job to re-weigh that evidence. But there has to be. . . This is such an unusual case, I think. Correct me if I'm wrong. And the counsel for Frank Lorenzo said this at the end of the hearing before the ALJ. This has got to be a unique situation where the only witness against Frank Lorenzo is Frank Lorenzo. There's no one. . . Greg doesn't testify. You don't have an assistant. You don't have any documents other than the e-mails that were sent. It's just Frank incriminating himself is the evidence. And he did a great job of it. Right. Well, that's the question, right? And did he really say something that indicates that he drafted all the material himself and didn't borrow from something Greg drafted? I guess I want to push Judge Srinivasan's questions another degree, and I think I was getting at this earlier. Janice says it seems not only someone who publishes the statement on behalf of another, which would be, I think, the complete cut and paste, would be publishing on behalf of another, but preparing on behalf of another, you're not the maker. And so you could compose a bit on your own, I believe, and that was the nature of my hypotheticals earlier, and still be covered by the Janice decision. And I still think that would be leaving out Justice Thomas' key points about attribution and delivery. I think those are two critical elements of Janice that are both present here. It's signed by Frank Lorenzo, it comes from Frank Lorenzo's account, and Frank Lorenzo pressed the send button. The public sphere reading that email would attribute that statement to Frank Lorenzo, particularly where the email itself says, although I'm doing it at the request of Frank Lorenzo, it's because they wanted a summary of what the Investment Banking Division thinks about this. Of course, Janice, I mean, in isolation you say Janice. Gee, it seems like a crazy, harsh decision in some respects, but then in the broader context of securities law what the court was getting at is primary violators need to be kept following from central bank in a circle. Aiding and abetting can be much, of course, broader, but we shouldn't be just roping in all the aiders and abettors as if they're primary violators for a variety of presumably penalty reasons, mens rea reasons, and that's why we've got to be careful about drawing the line here. May I make one point on that, Judge Kavanaugh? I think the two takeaway points from Janice are we're going to focus specifically on the word make. What does make mean? And so in that respect, Janice does not apply outside the context of 10b-5b. And the second point, to the extent that Justice Thomas strayed from the text of the word make, he was focusing on not expanding a private cause of action for private litigants, and those concerns are not going to be as great here before the commission if Janice is limited to 10b-5b because reliance would be much more difficult. I haven't even asked you about the sanctions. Go ahead. Yeah, keep going. Sorry to belabor this. I just want to make sure I understand the possible evidentiary foundations for the theory of liability that resulted in the sanctions that we'll get to. So we have 155. We talked about 156. We talked about 209, I think. I thought there was a fourth one. 217, Your Honor. And what was 217? Greg Lorenzo asked me to send that out, the e-mails out. Right. And that doesn't seem at all inconsistent with the notion that Greg did all the content and I just was a pass-through agent because it's consistent with that, right? But it's also consistent with Frank Lorenzo drafting it and Greg asking him to send it out. Yes, I get that it is inconsistent. Yeah, okay. So I think for this Court to come in and upset that finding, you'd have to re-weigh evidence on particular pieces of evidence that could cut in either direction, although when read against the flat statement at 155 that I authored and then it was approved by Greg and Mike. It just seems to me that all roads lead back to 155 because even if you had everything other than 155, let's suppose you had everything other than 155, it would seem pretty remarkable then to come up with a scenario under which Frank was the content maker based on all the other stuff you pointed to because none of the other stuff you pointed to actually directly says he was the content maker. There really has to be something that supports that proposition. Now, 155 could. I'm not saying that it doesn't. And then I understand that everything else around 155 could be seen, at least a lot could be seen as supportive of the scenario that you draw from 155, but it does seem like all roads lead to the snippet on 155. I would say you're on a 155 and then the statements in Janus about delivery and attribution. And then one last question about this line, which is that do you disagree with the proposition that if, hypothetically, if we were to disagree with you on whether Frank's the maker for purposes of 10b-5b and therefore 10b-5b is gone as a predicate for the sanctions, that we can't sustain the commission's result on the theory that the other predicates for the sanctions independently suffice and we can lead into the commission's decision that they thought would independently suffice? I would disagree, Your Honor. I would refer the panel to page 930 of the appendix where the commission made very clear that its non-Janus-based findings under 10b-5a and c and section 17a were independent liability findings. So they definitely said that, and then there was another portion where they said that on the prior page, I think. But it doesn't say that this, in other words, you can imagine a scenario in which, say, well, $15,000 and a lifetime ban. Yes, it's true that we could do the exact same things based on everything other than 10b-5b, but when we take into account the totality of circumstances, 10b-5b is a more serious thing. It has a higher degree of scienter. I'm just hypothesizing a scenario under which the commission thought, therefore, in order to get to this level of sanctions, we need 10b-5b. I guess I didn't see anything in there that would give us sufficient confirmation that the commission necessarily would have reached the same result without this. Two responses, Your Honor. First, the commission would certainly push back against the statement that rule 10b-5b is the more serious violation compared to a and c. And then second, if you turn to the discussion of sanctions, it's focusing on the conduct, sending the e-mails with a high level of scienter, egregiously refusing to take responsibility. All of those factors speak to the conduct itself, instead of whether with a particular provision under 10b or 17a. Because that argument wasn't made in your brief, unless I missed it, that we don't even have to worry about a Janus problem because the other stuff independently stands up to support the sanctions. Or did you make that argument? I don't think it's waived. I think it's shared in what we're reading in the brief. If we do, I believe, cite that quote from 930, pointing out that it's an independent ground. One last question. Why weren't there other witnesses? I don't know, Your Honor. Okay. Sanctions. Sanctions. What do we do with our columns and the cases that say it has to be compared to other cases? Your Honor, cases like Kornman and Lucia and Sagers, I'll say that you do not compare, that it's not this Court's job to compare, that instead I think the lesson that can be drawn from this Court's cases is that the Court has given the Commission clear instruction on what it has to do to justify a sanction. So I think the cases fall into one of two ledgers. On the one ledger, you have cases like Sodd and Rockey's Fund, where the Commission, this Court concluded, failed to explain what it was doing and tying what it was doing to the public interest. That's one ledger. On the other side, you have cases like Lucia and Kornman and Sears and Sagers and Geiger, where the Court is saying we are not going to reevaluate this in the first instance as if we were doing it on a clean slate. Rather, we look to the particular analysis that the Commission gave and decided whether that tied to the particular factors at issue here, the public interest. In this particular case, the Commission spent nine and a half pages walking through why a permanent bar was justified for Frank Lorenzo. Maybe you covered this, but in Collins we said a review for whether an agency's sanction is arbitrary or capricious requires consideration of whether the sanction is out of line with the agency's decisions in other cases. I think that statement would be inconsistent with the statement most recently in Lucia and also in Kornman and Sagers. Going back to the Butts decision from the Supreme Court, that I believe predates the decision you're referencing, that says that it's not the Court's task to compare sanctions or provide some sort of mechanistic formula for the agency to decide. I think we said the same thing in Friedman v. Sebelius. 2012, 2013. And then we got Paz, which is a little different, but we passed securities, which requires addressing the nature of the violation and the mitigating factors presented in the record. Even accepting that there are two disparate lines of cases, I think regardless of what the standard is, it's satisfied here. Starting at page 933 of the record, his conduct was egregious. He didn't tell. It was grossly misleading, if not outright lying, to retail customers about the significant risks. What's your best case where someone comparable has been given a lifetime bar? I would say Kornman might come close, because in that case you have something where there's no financial harm but you have a high degree of scienter and you have an individual who lies to the regulatory body, and this Court viewed that lie as an affront to the regulatory process itself, as justifying a permanent bar. Do you not read, I guess I'm wondering if this is part of your argument, because I haven't heard you say it, and maybe it's just because it's wrong, but I thought that one aspect of Collins and some of the other cases that seem to stand against you is that it at least requires the agency to try to explain why a seeming disproportionality might actually turn out to be explainable. And that would be consistent with this Court's case in Sod, and it would also be fully consistent with what the Commission did here, which is walk through the Flannery case and explain why it's different. Right. It, of course, leads up to the question of whether the explanation is more than cursory, but at least if the way that you read those cases is not that it requires substantively that there be no disproportionality, but it requires the Commission to explain the seeming disproportionality. That would be a wonderful way to sort of see the two lines of cases dovetail, and factually, particularly in this case, it distinguished Flannery because one of the two individuals had no scienter. He himself believed that the statements were true. But it's not just distinguishing a case that's similar. It's finding cases with the same sanctions that are similar. I'm not aware of that requirement in Corman. This Court made clear that we're Congress. That's the Collins potential. I mean, just when we review sentencing decisions, of course, we're very deferential in sentencing decisions, but some out-of-whack sentence, one of the ways you can show it's not out-of-whack, of course, not unreasonable, is that there are other cases with similar activity that have gotten similarly harsh sentences. And so that's one of the things we commonly look at. And in Corman, this Court, quoting the Supreme Court's decision in American Power and Light, said when an agency is statutorily authorized to impose a particular sanction, it's peculiarly within the province of the agency to determine the relationship between the remedy and the facts on the ground in that particular case. Okay, but be that as it may, is there another case where there's a lifetime sanction that's similar to this? In Lucia, the Court focused on how the level of scienter was quite high, and so that was in large part why the permanent borrower was justified. In the Sears case, this is two e-mails in a five-minute period that result in $15,000 a loss. And a lot of these cases, as you know better than I and the Commission, of course, are long, multi-stage frauds over multiple months with lots of victims and lots of money. Yes, Your Honor, but certainly nothing in the statute says there's a get-out-of-bar-free card if you only have two violations instead of one. I'm not excusing the conduct. I'm just trying to see if there's something disproportionate about a lifetime bar in these circumstances because, as you well know, there are lots of cases with lots of activity. This did seem, at a minimum, a serious mistake, but it was two e-mails sent at least initiated by your boss that resulted in minimal harm. $15,000 is not nothing, but it's minimal on the scale of what the SEC confronts many times. Judge Kevin, I think that's telling part of the story. The other part of the story is that the Commission justified its decision because of Frank Lorenzo's inability to acknowledge what he did was wrong. And so you have cases like Sirius and cases like Lucia where you have someone who's not acknowledging what he did is wrong. That is an independent justification for a permanent bar. Here, that particular factual scenario is magnified because not only did he not acknowledge, he tried to push the blame on waste to energy and also on Greg Lorenzo. Well, I guess that folds back on the merits. Greg is at least partially responsible. He never would have sent the e-mails if Greg hadn't asked him, correct? I think that is, if he hadn't asked him, I think that is probably correct. Yeah. But that also ignores his misrepresentation to trying to pin the blame on waste to energy. His attempt to pin blame on waste to energy, Your Honor, is quite remarkable. He takes waste to energy to task for not flagging the write-down, but that is exactly what he did when he sent the e-mails out October 14th. And as you conceded, at the most, he knew about the write-down by October 5th, and yet he still sent the e-mails that time instead. That's where the October 2nd e-mails are no longer viable. Not that they weren't October 2nd, but they're particularly not viable after October 5th. And you're right that that's a problem for him. And I actually think, Your Honor, the October 2nd e-mails were never viable because— I agree. I agree they were not viable, but they're even less viable after— Well, they're not viable based on what Franklin Renza knew at the time. On page 127, he conceded that those were dead assets. And so the write-down itself is a bit of a sideshow. It just seems extreme to me, but, you know, that's just an instinct of a lifetime bar based on these e-mails. So that instinct, I try to find, okay, well, the commission is going to come up, no doubt, with a laundry list of similar circumstances, and I just don't see that. I think the commission focused on the importance of, this is 934, of communicating truthfully with potential investors and the significant risk— So the false statement, I'll think about that some more, the false statement angle to the whole thing. Are you saying it was false or just kind of deflecting? Well, the waste of energy is, I think, deflecting. I don't see how that would be false, but it's a serious deflection. He takes waste of energy to task and then repeats the very mistake for which he took waste of energy to task for. Great. Thank you very much. Thank you very much. Mr. Helm, we'll give you back two minutes. I just wanted to address initially one of the points that the court made about Mr. Lorenzo's conduct resulting in a $15,000 loss. Actually, on the facts of the record, the investor bought the particular bond two months after the email was sent, and that investor had a separate broker that was not a client of Mr. Lorenzo's, so there's nothing in the record that would indicate that the customer purchased the bond as a result of the email that was sent. Also, getting back to the concept of whether it's significant that Mr. Lorenzo testified that he authored the email, I think the language of Janus is significant when it says that even a person who substantially participates in the creation of the statement is not necessarily the maker of it. And given all of the other evidence that's in the record, I don't think it was reasonable for the SEC to conclude that Mr. Lorenzo had the ultimate control or authority. If all we had was the snippet about authoring, though, it's hard to distinguish between authoring and making under Janus, wouldn't you admit? Well, I think that ties into the point that the SEC argued about the attribution, which I don't think is correct either. It's not supported by the evidence. If we're going to parse the language like the SEC is doing, the email, in fact, says it's being sent on behalf of the Investment Banking Division at the brokerage firm. It's not being sent under the language. Well, he's the head of that, though. He is the head of it. But the authoring is also a synonym, I would think, for preparing, and preparing is not enough, so Janus says, preparing on behalf of another. I think the on behalf of another is really the critical part of this. Yes, I think that's correct. And I think if the Court were to expand the holding to other parts of Rule 10b-5 and Section 17a, or I'm sorry, to limit the Janus holding just to subsection b, it would really nullify and undermine the Supreme Court's decision in Janus by allowing the SEC to convert essentially a misstatement case into an active scheme case. It would have actually no impact at all then, Janus, correct? Correct. It just completely takes Janus out of the picture because it allows the SEC to just bring a misstatement case as an active scheme case, which nullifies Janus completely. Thank you very much. Case is submitted.
judges: Griffith, Kavanaugh, Srinivasan